et al. Arguments not to exceed 15 minutes per side. Mr. Osmore for the appellant. Your Honor, I would like to reserve five minutes for my rebuttal. Your Honor, this appeal involves the involves egg discrimination, race discrimination, and gender discrimination claims, which arose from the discharge of the plaintiff from her job as a public safety officer for the defendant hospital for alleged inappropriate interaction with the emergency room staff and the patient she was called to put in restraint. The plaintiff brings five issues before the court. The first issue is with respect to the Michigan peer review statute. The district court denied the plaintiff's motion to compel the production of the incident report that was the basis of her being terminated from the job. The plaintiff is a security officer. The hospital asserted confidentiality privilege over the incident report based on the Michigan peer review statute, which only pertains to licensed medical professionals. And we think that plaintiff thinks that's an error because the peer review statute, as the Michigan Supreme Court has stated, may only be invoked for information gathered for peer review functions. And peer dentists and nurses. So we think it's an error for the court, for the district court, to deny the production of the incident report about the conduct of a security officer, you know, that was called to perform a police act, you know, putting a patient in restraint. Counsel, what you call the incident report, how does that differ from its exhibit 21, document 2722 that is sometimes referred to as an incident report? This is the June 16th report by Hernandez. Is that a different incident report? There are different incident reports. In this incident, there were three incident reports. Okay, that's what I wanted to know. There was the emergency room progressive notes about the incident, which was written by the patient's nurse. Is that Moak? No, by Anna Novak. Novak. The patient's care nurse. The hospital produced that document without being asked to produce it. There was the security incident report written by the security officer that responded to the incident, which was plaintiff. She was the Then there was a report, a complaint filed by two nurses who claimed that she overstepped her authority during the incident. Those two nurses, that's Bott and Moak? And they were complaining about the conduct of the security officer. It had nothing to do with the treatment of the patient or any medical practice for the defendant to claim privilege over that incident report, which was the basis of determination of the plaintiff. That, what you call incident report, is that P-E-R-E-R-S report? They call it potential error event reporting system. That's the third of the three that you've just mentioned. That's correct. What about Hernandez's report? What do you call that then? That's also dated June 16th, which I guess is the date of the incident. Hernandez's report was dated much later That was a report he prepared for the, I think that was a report for arbitration by the labor union. It had nothing to do with the incident itself. It was not written on the is the rule that the district court applied in deciding the motion for summary disposition pursuant to Rule 56 of the Federal Rules of Civil Procedure. The court assumed every allegation made by the defendants. The court assumed that there was an investigation when there was no investigation. The court relied on the interview obtained August 1st to terminate the plaintiff on July 1st. The hospital never interviewed the patient's care nurse, Anna Novart. They never reviewed the emergency room progress notes about the incident. They never reviewed the surveillance video of the area around the patient's room. They never talked to any of the security officers that attended the incident on June 16th. I'm sorry, when you say they never talked to any of the officers, is that Kowalik and Sikorski? Peter Kowalik and Dave Sikorski. But I thought it was pretty clear that they did have statements from those people. supervisors after they received the complaint, the peer review complaint against Anita Lloyd, asked the three officers that attended the incident to report what they observed. Dave Sikorski wrote a statement, Anita, the plaintiff wrote a statement, and Dave, Peter Kowalik also wrote a statement. Were those statements prior to July 1, 2011 when she was discharged? Those statements were on June 16th. Which was the date of the incident, so it would have been fresh in all of the people's minds. And of the three statements, only Dave Sikorski's statement was different. I made allegations against the plaintiff. Dave Sikorski was the plaintiff's arch rival in their department. He was second in seniority to the plaintiff, who was the most senior in the department. He was ten years junior in their seniority ranking. And he made, you know, embellished, fabricated allegations, statements that the plaintiff made to staff nurses, he claimed that they were made to the patients. Kowalik, if you compare Kowalik's statements and Sikorski's statements, they were opposite each other. Kowalik stated that the plaintiff said to one of the staff that coming to the ER for drugs and alcohol is different than coming to the ER as a psych patient. Which plaintiff admitted she made to Nurse Mark in the hallway. But Sikorski said the statement was made to the patient, that the plaintiff told the patient, oh, if you are here for drugs, you know, you don't have to stay if you don't want to stay. They can't keep you. And told the nurses, you can't keep her if she's only here for drugs. Your client concedes that she did question, right, whether this patient was properly there in the psychiatric ward. The plaintiff did inquire whether the patient was under certification and petition to stay in the hospital, because the hospital rule is that unless there's a petition and certification, a patient cannot be held against their will in the hospital. That action was in violation of the hospital's policy, wasn't it, for security officers? I'm quoting from the directive that security guards, quote, shall expect that medical personnel have made an assessment of the situation and adhere to restraint protocols. That's a guideline, but the security officer has duties and responsibilities, which requires her to enforce hospital rules and procedures. Yeah, but she's supposed to take the medical professional's word for it that this patient needs restraint. That's true, but that doesn't mean she cannot question, because she came in, she was the security officer in charge of the ER that evening. So when she responded to the call for assistance, she went into the room and there was a patient sitting down there. There was nothing happening. The patient was quiet. So to diffuse the situation, she said, hello, young lady, is there a problem? Then the patient related that she's been here all day, she came to get help with her drug problem, and she wants to go home. She doesn't want to stay. So she told the patient, that's up to your medical staff. That's not the way the statements are from the two other security officers. The two other security officers were not there when the patient, when the plane first arrived, because they were not assigned to the ER. They were outside, they came to assist also. And if you read their statement, they stated that by the time they arrived, that Anita was talking, discussing the patient's situation. They were the two who actually restrained the patient, right? Pardon me? The two that came in were the two who actually restrained the patient. The two of them restrained the patient. All the, you know, the staff nurse, the staff nurses, the patient's care nurse, Anna Novak, and even the child nurse, Sonia Moak, you said that all of them, you know, assisted in restraining the patient. Your client didn't help. My client did. My client and Officer Kowalik, you know, held the patient's legs. She held one leg and Kowalik held one leg. Sikorski held one hand and Bott held the other hand. What's the source of that statement you just gave us? That's Anita Loy's recollection of what happened. She and Kowalik were at the foot of the bed. Sikorski and Bott were at the head of the bed. Bott pushed the patient down, grabbed one hand, and Sikorski— There's a contrary statement that, in fact, your client just stood back and didn't help restrain at all. That was Sikorski because Sikorski wanted to get Anita Loy into trouble. I'm just asking, where in the record is what you just said about Ms. Loy's statement that she held her leg and one leg and whatever? Where would I find that in the record? In her affidavit. I don't have it before me. Counsel, I think your time's expired unless the other judges have any questions. You'll have your five minutes for rebuttal. May it please the Court, Daniel Bretz on behalf of St. Joseph Mercy Oakland Hospital and four of the five individual defendants. I believe we advised the Court one of the defendants named in the complaint was not served. That would be Mark Bott. Plaintiff has alleged five counts, age, race, and sex discrimination under Title VII and two state law tort claims, interference with contractual relations and intentional infliction of emotional distress. The lower court correctly held that plaintiff could neither establish a prima facie case of discrimination nor did plaintiff show pretext for discrimination. The lower court based its ruling on the fact that plaintiff could not show any dissimilar treatment of non-protected individuals. She can't show race discrimination because she was replaced by an African-American female, right? She can't claim sex discrimination because it was both women. But she could claim, why couldn't she claim age discrimination? She was 52, she was replaced by a 39-year-old. Well, she could claim it. That seems to me like it establishes a prima facie case. She can claim it, but as the Court knows in Gross v. FBL, it's a heightened standard for age discrimination claims. A plaintiff must show, but for her age, she would not have been terminated. I asked plaintiff at her deposition what her evidence of age discrimination was. If she had any evidence of a predisposition or bias or motivation to discriminate on the basis of age. She had none. The only evidence she could come up with was a rumor, which she described as hearsay, that she'd heard two years earlier from an unnamed person that she heard the hospital was going to get rid of older workers. This had nothing to do with her termination. It wasn't made by a decision-maker. It was clear hearsay, as the plaintiff acknowledged. So that is no evidence. It's not admissible even at the summary judgment. It sounds to me like she makes a prima facie case. Then, of course, you've got to give a reasonable explanation. Then she has to show that that's pretext. But I'm just saying, I don't know, the district judge made it sound like maybe she didn't even get to a prima facie case of age discrimination. It's not to me that she did do that. One of the elements is that she has to show she's qualified. One of the elements is also that she needs to show dissimilar treatment of similarly situated workers. The hospital came forward with evidence that a younger white male was terminated for a single event of abandoning his post. The plaintiff received lesser discipline for the same event. She got a final written warning. Another younger white man got a final written warning for abandoning his post. Same as plaintiff. So there was favorable evidence of comparable treatment. Plaintiff pointed to none. But to your Honor's point, the district court really based its holding on the fact that plaintiff had no evidence of discrimination to establish pretext. She could neither show any intentional discrimination, any predisposition to discriminate on the part of the decision-makers, or any evidence of dissimilar or inappropriate treatment. Plaintiff also could not overcome the good faith belief doctrine, which this court has adhered to in the Seeger v. Cincinnati Bell case. I was here a year ago with Judge Clay in the Judician v. Advantage Health. Here the hospital conducted an investigation. They had witnesses to the plaintiff's misconduct. Both the misconduct that led up to her discharge, where she was placed on a final written warning, the two incidents, and plaintiff's conduct at the time of her discharge. And there's two facts here. One, we had reasonable, credible evidence, particularized facts upon which the hospital relied and made a reasoned decision. And secondly, even here today, plaintiff does not deny the essential conduct with which she was charged. Plaintiff does not deny that she questioned the patient. Plaintiff does not deny that she did not obey the nurse's orders to place restraints on the patient. Plaintiff does not deny that she gave advice to the patient about leaving AMA, against medical advice. All of those acts, which she admits to, violate hospital policy, squarely. Counsel, I didn't hear your response to Judge Gilman's question. If there was a prima facie case of age discrimination, then your explanation as to why it was acceptable to replace her with the 39-year-old. I mean, you painted with some broad strokes of the entire picture and all the proofs and such, but I didn't hear a specific response from you as to that. Well, there are four elements to a prima facie case. One is that she was replaced. She was terminated, which she's satisfied. Two, that she was replaced by a younger worker, which she has satisfied. Three, that she was qualified for the job, which we say, based on her own admissions, she was not. Based on her own admitted conduct. Well, she was qualified in that she was maintained in the job and did the job for a period of time. Now, whether she was properly let go for an instance of misconduct might be a different thing, but I don't think the—apparently the employer thought she was qualified for the position, and they maintained her in the position. So I think she meets that criteria. And, Judge Clay, I don't dispute there are some differing opinions out of this court about the qualification standards, whether you have to meet the minimum qualifications, which she did on paper, or whether you need to meet the employer's expectations, which we submit she did not. So there are two lines of law on that, on the qualification standard. Finally, the prima facie case requires a showing of dissimilar treatment, such that it would give rise to an inference of discrimination, and we submit she has not shown that. With respect to the disagreement, potentially, about what happened in the emergency room, your adversary said that she indicated that she had, in fact, helped with the restraints. What's your understanding on that? He indicated that this was something from an affidavit. Yes. What's your understanding of the record, because he didn't have a citation? I heard him say that, and I didn't have time to pull the documents, so this is my memory, and I apologize for that. My memory is that her deposition, she didn't recall whether she assisted with the restraint. The witnesses said she did not, and I believe in her affidavit, she did say, and I'd have to check it to be certain, that she did say in her affidavit, contrary to her deposition, that she assisted holding her leg. That's all long after the event, so there's not something in the record where she tells the hospital, hey, wait a minute, I really did this. No, she did not. This is either from a deposition or an affidavit, both of which are after litigation has begun. Is that your understanding? That's my recollection. Okay, so if we wanted to find this, we would look for it in a deposition and a post-deposition affidavit. Is that right, from your point of view? Correct. The affidavit accompanied their response to my motion. Counsel, I'm concerned that your client asserts the privilege as to this peers report under the Michigan Peer Review statute, yet at the same time your client uses information from the report with respect to which it asserts the privilege in the litigation, certainly in the summary of the report that your client would not share with the plaintiff. I'm just not as clear as how you can assert the privilege, not permit disclosure, and then use the report both at the same time. What would you say to that? Well, we didn't use the report. There is a section in Mr. Hernandez's contemporaneous investigation that reflects a summary of what Nurse Moak reported. Yes, but the summary was of information from the report, and nobody can check to see if you're accurately extracting information from the report because you won't let the plaintiff see the report. So you're actually using the report or information from the report, putting it into a summary, and refusing to disclose the report itself. And the district judge says that's okay, and I'm having trouble figuring out why there's not an abuse of discretion. Well, your Honor is right as to the standard. It is an abuse of discretion standard. The summary is not the report, and I understand the court may have a quibble with that distinction, but it is a distinction. Well, it's more than a quibble. I mean, that's the only place the information in the summary was derived from, from the report itself. Your client is unabashedly and unashamedly using that information. Well, it's not the report, and the peer review system is set up. This nurse utilized the PEERS system, all caps, P-E-R-S, P-E-E-R-S, to report a near miss and a patient safety issue. That system is privileged under state law, and all of the investigation that flows from that report is a privileged investigation of a near miss of a patient safety issue in a hospital. Sure, but that's not the point of concern here. Nurse Moak, and I apologize, I just may finish. Nurse Moak was produced for deposition. We let Mr. Osmore take her deposition and inquire as to all aspects of this. But yes, the hospital takes very seriously its privilege about investigating near misses and patient safety incidents occurring on its premises. With regard to the quote summary of the PEERS report, help me here, because you said, which is what I thought, that we're referring to Hernandez's report, which begins with five lines, four and a half lines, that may be from the PEERS report. Is that the summary we're talking about? Correct. Because everything else that's in Hernandez's report, I didn't see any other part of it that might have come from the PEERS report. Is that accurate? That's accurate. Every other witness was interviewed separately. So the only part that's quote the summary of the PEERS report is the four and a half lines on the first page of Hernandez's report? Correct. And to be frank with the court, I've never seen the PEERS report. It's never been disclosed to me. What Hernandez testified to is that he spoke with Nurse Moak on the phone following her utilization of the PEERS system. So this is her statement. Does that mean on that day or approximately that day? Before the plaintiff was terminated, he testified. Okay. Do you have a site for that? Because I tried to find that in what was in Exhibit 25, Hernandez's deposition, and I did not find it. So another place. Do you have a page ID reference? Yes. Pages 166 to 168. Now the pages you're giving is deposition pages? Yes. Okay. Do you have a page ID record reference? I do not because this issue was never raised before the district court. So the answer may be that it is in the deposition but not in the full record? Yes. Is that a fair statement? That is fair, and we offer to supplement. Judge Clay had a question. And I can read the question and answer if the court wishes. Didn't you use the report in more than one instance, including, for example, in your client's EEOC filing, the PEERS report information? No. I don't believe so, Your Honor. I'm not looking at that, but the only place that comes up is what Hernandez typed, as Judge Boggs said, about five lines. Based on Mr. Smoke's report, he talked to her following that. And he also, you said, talked to Bott. He says that as well? He talked to Bott. Bott's statement is dated, I believe, August 8th. But Hernandez testified without dispute. Bott worked midnights. Okay. I understand that. There was a delay in getting this. So help me just one more thing then. The Hernandez report, which does have all this stuff in it, when was that actually created? Because it includes a reference to the Moke interview of August 1, which implies that it would have been created after August 1. Right. He spoke with her again. He spoke with her immediately after the incident. That's on page 1, dated June 16. That's what started this whole investigation. And then he spoke to her again during the grievance procedure.  I'm sorry. The document that we have, document 27-22, that document would have been created after August 1. What Mr. In its full glory. Here's Mr. Hernandez' testimony on point. Quote, it was a Word document. It was running file, and we would go back and add to it. It was kept on my computer. Is there a statement or testimony by the decision-makers as to how much of it or what they had before them at the time of making the decision? Yes. Mr. Hernandez said he had spoken to Bott, Moke. But Hernandez isn't the decision-maker. That's what I'm saying, is what did the decision-makers see? The decision-makers were the supervisors, Kazimer and Williams. They received from Hernandez his summary of interviews. And there's some handwritten and other statements. You'll see Mr. Williams sent a question to Mr. Kowalik and Mr. Sikorski. They both supplied responses within a day or two in June. Mr. Bott was interviewed by Mr. Hernandez by phone, as was Nurse Moke. At a minimum, they had Anita Lloyd's statements, Sikorski's and Kowalik's, which are contemporaneously. What they had were the statements that Hernandez is referring to. And they had some earlier version, let's say, of Hernandez's report, because the one that's in the record wasn't created completely until after August 1. Is that fair? That's fair. Okay. Just a quick question. Is there anything in the record as to why the union dropped its grievance? Yes. And I apologize it's a record site, but it's in the briefs. There's a letter from the union attorney saying they did not find the grievance to have merit. So they did not proceed with the wrongful discharge or just cause grievance proceeding. Is there any legal significance to that? Well, I think it's legal significance in that it's corroborating evidence that the hospital found, in good faith, particularized facts upon which it based its decision. But to be frank with the court, no, it doesn't undercut a claim of discrimination by itself. I know you're out of time, but one last quick thing, and not to beat a dead horse, but the district court in its order made reference to excerpts of the peer review report being submitted to the EEOC and the Michigan Department of Civil Rights. Did that happen or not happen? I did not do that proceeding, but my understanding is, no, it did not happen. If anything, it was simply these five lines from Hernando's report. So if the judge said that these excerpts were given, he would be mistaken is what you're saying? I believe so. And you base that on what? Based on the fact that I've dealt with this hospital for many years, and they do not let me even see their peer review reporting system. Yeah, but that doesn't tell us whether they used those reports and information they submitted to the EEOC and the Michigan Department of Civil Rights. Maybe you just don't know is what you're telling me. Do you have a page reference for the judge's section? Record 24, page ID number 245. Okay. Your Honor, I would concede I don't know for certain. I don't have the document. Okay. Okay. Thank you. Thank you, Mr. Osamor. You have your rebuttal. First of all, Your Honor, Ms. Mork testified at her deposition that she was only interviewed once, and that was in August when she was interviewed over the telephone. That's what she testified to during her deposition. Also, the Hernandez report was obtained by the plaintiff from the EEOC before the complaint was even filed. So we did not obtain that summary from the plaintiff during the discovery period. The Hernandez report was prepared for the grievance proceeding, and before that grievance proceeding, the union president, Mr. Donald Reed, told Ms. Lloyd that the supervisors don't want you back, and there was nothing more they could do. Instead, they negotiated for her to accept $5,000 and file or submit a resignation letter. She refused to do that. Second. It does sort of hurt your claim a little bit that the union decided the grievance had no merit, doesn't it? No. The union said the supervisors don't want her back, and there was nothing they could do to rinse that out. If they felt there was discrimination, they certainly would have proceeded. Ms. Lloyd was asking for a reinstatement to her job, and the union told her they wouldn't take you back, and there was nothing more they could do. So they negotiated a $5,000 settlement for her, which she refused, and decided to take the matter to court. And Mork testified during her deposition that all the security officers assisted in restraining the patient. The patient care nurse, Novak, testified during her deposition that all the officers assisted in restraining the patient. I have a note that Novak testified that she was, quote, So she wasn't even present. That's not true. The officers arrived at the scene after the patient had been sedated. So retrieving the medication wasn't even – the officers were not there. Novak went to the crib to obtain medication to sedate the patient before the security officers arrived. So after the officers arrived, Novak was there all the time because the medication had already been applied to the patient. The security officers were not present when she was medicated, when she was sedated. So it was not – she could not be going to get the medication while the security officers were there. Are you saying she was already sedated at the time that she was supposedly pulling the IV out and so on? She had already been – no, she was sedated after she was attempting to pull out the IV. Afterwards. Yes. And by the time the officers arrived, she had quieted down and was sitting by her bed, and the nurses dispersed and left her alone. At that point, Ms. Lloyd arrived, and she was alone in the patient's room. She went in there, and she was not acting up, she was not being aggressive, and she stated in her affidavit, I didn't know what issues she had before we arrived. Officer Kowalik also stated that the patient was quiet, and he saw no reason in the patient's room, and he stepped out. The only time – this – when Officer Lloyd arrived, and the patient indicated she wanted to go home, and she said, it's up to your medical staff whether you go home or not. Then she went outside to look for the staff nurses, and ran into Mark, and asked her whether the patient – the situation of the patient in ER 19, and Mark confirmed what the patient said, that she was brought to the ER for evaluation from the common ground. All the other statements say, look, she was telling the patient, you don't have to stay here. You're here just for drugs. She never said that. Mark never heard her say that. Kowalik never heard her say that. The patients brought here on drugs and alcohol are different from psych patients. A statement she made out in the hallway to Mark, when she was asking Mark whether the patient was petitioned and certified, and Mark said she didn't know. And she said, the reason I'm asking is because drug patients and alcohol patients usually walk in here for treatment, and they will live on their own when they sober up. Then Mark said, let me go and check. It was then Mark went out to check and called the social worker on the phone, and she confirmed that she was petitioned and certified. And so when she came back, Bob led the group to the patient's bed, and they started putting the patient under restraint. And after she was put under restraint, of course she was resisting, but she was restrained in the four limbs, so she couldn't bite out, you know, bite her IV out, and it was only an IV port. It wasn't hooked onto the IV stand. Ms. Loy didn't see the IV because the patient was wearing a long-sleeve gown. Okay, counsel, I think your time has expired unless my colleagues have any further questions. Thank you, counsel. That case will be submitted, and the clerk may call the remaining cases.